## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

STEPHEN RAY ESPINOZA,　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Plaintiff,　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　　Case No. 13-CV-246-PJC
　　　　　　　　　　　　　　　　　　　)
CAROLYN W. COLVIN,　　　　　　　　)
Acting Commissioner of the　　　　　　)
Social Security Administration,　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　Defendant.　　　　)
　　　　　　　　　　　　　　　　　　　)

## OPINION AND ORDER

Claimant, Stephen Ray Espinoza ("Espinoza"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Espinoza's application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Johnson appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that she was not disabled.  For the reasons discussed below, the Court **REVERSES AND REMANDS** the Commissioner's decision.

### Claimant's Background

At the hearing before the ALJ on January 26, 2012, Espinoza was fifty-one years old. (R. 83).  He graduated from high school, but had no further education, training, or certificates. (R. 50).  Espinoza testified that he had a driver's license and that he had his own vehicle, but that

his wife drove him on the date of the hearing. (R. 50, 52-53).  He stated that he had four previous arrests, the last of which occurred in April of 1995. (R. 51).  Espinoza asserted that all but one of his arrests were alcohol-related, and that he previously struggled with alcoholism. *Id.*  He said that he had attended Alcoholics Anonymous ("AA") for some time, but stopped attending more than one year prior to the administrative hearing. (R. 52).  Espinoza lived with his wife in a four-bedroom house on approximately two acres of land. (R. 50).  He stated that his wife routinely mowed the yard and that he had not been able to do so for about two years. *Id.*

According to Espinoza's testimony, his inability to work stemmed largely from long-term pain in his left ankle, knee, back, and right hip, as well as his struggle with depression and bipolar disorder. (R. 57-58, 66-67).  He said that he suffered from osteoarthritis and that previous doctors had described his condition as being "out of alignment." (R. 58, 82).  He had previously seen an orthopedist regarding the pain, but he had not been able to do so in approximately five years because he could no longer afford coverage under his wife's insurance policy. (R. 59).  He further described his inability to sit for more than forty-five minutes without needing to stand or recline in order to alleviate his lower back and hip pain. (R. 60).  He also stated that he could not stand in one place for more than forty-five minutes without walking or sitting down to ease his ankle and lower back pain. *Id.*  He testified that he could walk "[m]aybe a block" at most before needing to take a break. *Id.*

At the administrative hearing, Espinoza used a self-prescribed cane, which he claimed prevented him from slipping and dislocating his kneecap.  (R. 61).  Espinoza testified that he suffered from general arthritis, which particularly caused pain in his thumbs, however, no localized diagnosis had been made.  *Id.*  He stated that kneeling, crouching, and crawling

presented great difficulties for him because he required assistance to get back up. (R. 79).

Espinoza testified that he was clinically diagnosed with depression and bipolar disorder. *Id.* Medication improved his ability to cope with the depression, but he still reported experiencing ten bad days per month, during which he often isolated himself in his bedroom and was unable to accomplish anything. (R. 67). These bad days also included low motivation, problems focusing, racing thoughts, and memory issues. (R. 67-68). Espinoza stated that his wife often had to remind him to do various tasks like go to the grocery store. (R. 69).

Espinoza testified that in his free time, he would read for an hour every day. (R. 61, 62). He stated that he and his wife went out to eat once a week. (R. 62). He did not watch movies or visit friends, but once a week he did laundry and picked up around the house. *Id.* Ezpinoza went grocery shopping once or twice a week for short periods of time, and he occasionally had trouble getting around the store. (R. 63). He often used a cane or a shopping basket to stabilize himself while he shopped. *Id.*

Espinoza testified that he typically woke up at around 7:00 a.m., when his wife left for work, and that he rarely ate breakfast. (R. 64). He also stated that he usually spent six to eight hours each day in his recliner watching television with occasional intermittent napping. (R. 65). He normally went to bed around 10:00 p.m., but his sleep was often interrupted by pain and discomfort. (R. 65-66). He said that he often did not feel rested when he awoke in the mornings. (R. 66).

Espinoza testified that he had received unemployment benefits since May 2010. (R. 54). He stated that prior to receiving unemployment, he had worked at a foundry, but was laid off due to work shortages. (R. 54, 72). Soon thereafter, he was asked to return to work at the foundry

but failed his physical, which precluded his return. (R. 56, 72-73). According to Espinoza's testimony, he had ongoing knee problems, which is why he was not cleared to return to work. (R. 74). Since that time, he primarily searched for jobs online, but his searches had been unsuccessful. (R. 55). Espinoza stated that he attempted to apply for at least one other foundry job despite knowing that his physical ailments prevented him from performing that type of work. (R. 75). Espinoza testified he had not applied for less physically demanding jobs. (R. 75-76). Instead, he applied for janitorial and shop-type jobs. (R. 55, 76). Espinoza agreed with the ALJ that the simultaneous receipt of unemployment benefits and application for disability benefits was inconsistent. (R. 54-55). Espinoza also admitted that he and his doctor collaborated in filling out his medical forms and that his doctor completed a residual functional capacity form according to Espinoza's wishes, in the hopes that it would help him regain his job. (R. 77-78). \

### Medical Evidence of Record

Espinoza's records indicate that he saw Bat Shunatona, M.D., on November 13, 2000. (R. 331). He complained of chronic congenital ankle pain. *Id.* Espinoza declined to consider surgery because the recovery time would caus him to miss work. *Id.* Dr. Shunatona's assessment was ankle pain and he prescribed a year's worth of Voltaren.[1] *Id.*

On November 29, 2001, Espinoza visited Michael Ward, M.D., for a new patient consultation. (R. 332-33). He complained of significant ankle pain, and stated that the pain continued up through his knees, hips, back, and up into his shoulders. (R. 332). Dr. Ward noted the relation between Espinoza's obesity and his arthritic difficulties, however no physical examination was performed at that time. *Id.* His assessment was degenerative foot disorder,

---

[1] Voltaren is used to treat osteoarthritis and rheumetoid arthritis. *www.pdr.net.*

secondary arthritis, morbid obesity, and probable depression. *Id.* Dr. Ward referred Espinoza to a podiatrist, discontinued his Arthrotec,[2] and prescribed Celebrex[3] and Vicoprofen.[4] *Id.*

Dr. Ward saw Espinoza again on January 10, 2002. (R. 334-35). He indicated that Espinoza displayed symptoms of depression and that he was at the lower range of moderate to severe depression. (R. 334). Once more, Dr. Ward discussed the impact of Espinoza's weight on both his physical pain and his depression. *Id.* On this occasion, Dr. Ward's assessment was forefoot navicular/calcanear[5] dysfunction with chronic pain, morbid obesity, fatigue, and stress related depression. *Id.* Espinoza was prescribed Effexor[6] in a gradually increasing dosage. *Id.*

On November 20, 2002, Espinoza returned to Dr. Ward's office seeking prescription refills. (R. 336-37). Dr. Ward made note of Espinoza's decision to decline surgery, despite recommendations by two separate podiatrists. (R. 336). Espinoza still showed symptoms of depression, however, Dr. Ward indicated that his symptoms had improved while on his prescribed medications. *Id.* Espinoza exhibited normal speech, logical thought processes, reasoning, and computations. *Id.* He had no hallucinations, delusions, obsessions, or suicidal ideation, and his judgement and insight appeared intact. *Id.* His orientation, recent and remote

---

[2] Arthrotec is used to treat signs and symptoms of osteoarthritis or rheumatoid arthritis, particularly in patients with high risks of developing ulcers. *www.pdr.net.*

[3] Celebrex provides relief for symptoms of both osteoarthritis and rheumatoid arthritis as well as acute pain. *www.pdr.net.*

[4] Vicoprofen is a short-term pain reliever. *www.pdr.net.*

[5] Navicular/ Calcanear refers to a boat shaped deformity. *DORLAND'S ILLUSTRATED MEDICAL DICTIONARY* 262, 1179 (29th ed. 2000) (herinafter "*DORLAND'S*").

[6] Effexor is prescribed to treat depression, general and social anxiety disorder, and panic disorder. *www.pdr.net.*

memory, attention span, concentration, and language skills were all intact and both his mood and affect were normal. *Id.* Dr. Ward's assessment included depression, osteoarthritis, tenosynovitis,[7] and a stress fracture. (R. 337).

Espinoza presented to Sharon Noel, D.O., on March 12, 2003 as a new patient and for a refill of his medications. (R. 338-39). He complained of persistent foot pain, however, he claimed that his medications controlled the pain and that he "[felt] pretty good." (R. 338). Dr. Noel's physical examination of Espinoza indicated no changes in his physical condition since his last evaluation by Dr. Ward. *Id.* Dr. Noel's assessment was ankle arthralgia[8] and pes planus[9] congenital. *Id.* Dr. Noel continued Espinoza's medication treatment plan. *Id.*

On May 30, 2003, Espinoza returned to see Dr. Noel for medication. (R. 340). Dr. Noel's physical examination and assessment were the same as her March 12, 2003 evaluation of Espinoza. *Id.* Accordingly, his medication treatment plan was continued. *Id.*

Following a four year gap in the records, Espinoza was seen by Donald Johnson, M.D. on May 1, 2007, after he fell while getting out of the bathtub. (R. 341-42). Espinoza's only physical complaint related to the fall was muffled hearing in his left ear. (R. 341). Dr. Johnson's assessment included a ruptured tympanic membrane, benign hypertension, and limb pain. (R. 342). He also made note of Espinoza's flat feet and resulting pain noting that Espinoza had deferred surgery because it would require him being off work for a year. *Id.* Dr. Johnson

---

[7] Tenosynovitis is inflamation of the tendon sheath. *DORLAND'S* at 1798.

[8] Arthralgia is a medical term for joint pain. *DORLAND'S* at 152.

[9] Pes planus is the medical term for flat feet. *DORLAND'S* at 1362, 1397.

prescribed Diovan.[10]  (R. 342).

On August 20, 2007, Espinoza presented to Dr. Johnson complaining of pain in his left side and hip. (R. 349-51).  He reportedly awoke the previous week with severe pain in his left flank area, and he claimed that his medications did little to ease the pain. (R. 349).  X-ray results indicated degenerative disk disease as the L4, L5 and L5 S1 with mild lumbar levoscoliosis.[11] (R. 348).  Dr. Johnson also noted that Espinoza's back was "tender to palpation in paravertebral muscle mass in spine[.]" (R. 350).  His assessment was back pain, and benign hypertension.  *Id.* Dr. Johnson concluded that Espinoza's lower back complications, as indicated by the X-ray, were likely the corollary of years of weight bearing related to his foot deformity.  *Id.*  He prescribed Flexeril[12] and referred Espinoza for a CT scan of his pelvis.  *Id.*

On September 13, 2007, Espinoza was seen by Charles Gebetsberger, M.D., after his left knee allegedly came out of socket. (R. 346-47).  His only reported symptoms were increased pain in his knee. (R. 346).  Dr. Gebetsberger refilled Espinoza's Lortab prescription to control the increased pain. (R. 347).

Espinoza presented to Dr. Johnson on August 18, 2008 and complained of back pain as a result of "working lots of overtime." (R. 260).  The doctor noted that Espinoza appeared well developed, nourished, obese, and did not appear to be distressed.  *Id.*  His lung and heart

---

[10]  Diovan is used to treat hypertension.  *www.pdr.net.*

[11] Levoscoliosis is an appreciable leftward deviation of the spine. *DORLAND'S* at 987, 1612.

[12] Flexeril is a muscle relaxant. *www.pdr.net.*

functions were normal.  *Id.*  At that time, Espinoza had already been prescribed Naproxen,[13]

Diovan, and Lortab,[14] and he did not report any complaints associated with regularly taking these

medications.  *Id.*  Dr. Johnson's assessment of Espinoza indicated benign hypertension and

chronic pain.  *Id.*  In addition to his current medications, Dr. Johnson prescribed Zanaflex.[15] (R.

261).

Espinoza presented to Dr. Johnson again on September 4, 2008 and complained of

depression related to domestic issues, however, he denied any suicidal tendencies. (R. 258-59).

He reported long periods of depression, sadness, pessimism, irritability, impatience, lack of or

diminished interest in usually pleasurable activities, fatigue or loss of energy, feelings of

hopelessness, poor concentration, and an inability to make decisions. (R. 258).  Espinoza was not

prescribed any medications for his depression, however, he indicated that previous anti-

depressive medication had controlled his symptoms.  *Id.*  He denied any weight gain or changes

in appetite, unusual weakness, bleeding, fever, chills, recent trauma, or infections.  *Id.*  He did

indicate varying degrees of chronic pain.  *Id.*  The doctor assessed Espinoza with bipolar

disorder and prescribed Effexor due to Espinoza's reported previous success with the drug.  (R.

259).

On January 16, 2009, Espinoza visited Dr. Johnson for a follow-up appointment

regarding his hypertension.  (R. 254-55).  The doctor noted that Diovan had not helped

---

[13] Naproxen is an anti-inflammatory used to relieve pain associated with arthritis and muscle aches. *www.pdr.net.*

[14] Lortab is prescribed to treat mild to severe pain. *www.pdr.net.*

[15] Zanaflex is a commonly prescribed muscle relaxer used to combat spasticity. *www.pdr.net.*

Espinoza's hypertension, and prescribed Exforge, an alternative hypertension medication, instead. (R. 255). Espinoza's major medical problems were listed as chronic degeneration, morbid obesity, depression, osteoarthritis, ankle pain, hypertension, limb pain, and bipolar disorder. (R. 254).

On January 30, 2009, Espinoza presented to Dr. Johnson for a medication check, at which time the doctor noted that Espinoza had lost 19 pounds in the previous 13 days, and that his depression had worsened. (R. 252-53). The doctor's assessment was hypertension, bipolar disorder, and limb pain. (R. 253). Espinoza's Exforge prescription was discontinued in favor of Hydrocodone. *Id.* After a March 9, 2009 visit to Dr. Johnson, Espinoza's Exforge prescription was reinstated, in addition to a prescription of Maxzide to aid in combating his hypertension. (R. 250-51). On that date, the doctor's assessment of Espinoza included hypertension and ankle pain. (R. 251). On a March 31, 2009 return visit, Dr. Johnson concluded that Espinoza was doing well on his medications. (R. 248-49).

During an April 10, 2009 visit with Dr. Johnson, Espinoza complained of chronic leg and back pain, which his Lortab did not control. (R. 246-47). He was diagnosed with limb pain and given trial supplies of MSIR[16] and MS Contin.[17] (R. 247).

Espinoza presented to Dr. Johnson on May 20, 2009 complaining of depression and weight loss. (R. 243-45). He reported being "severely depressed," and stated that he could not afford to see a psychiatrist. (R. 243). Dr. Johnson noted that Effexor was no longer effective and

---

[16] MSIR is commonly known as morphine. *www.pdr.net.*

[17] MS Contin is an apioid analglesic used when relief from moderate to severe pain is necessary for an extended period of time. *www.pdr.net.*

that the Espinoza's overall appearance was sad. (R. 244). Once more, Espinoza was assessed with hypertension and depression. *Id*. All of Espinoza's medications were continued with the exception of Effexor, which was replaced with a prescription for Lithium. *Id.*

On June 15, 2009, Espinoza reported that the Lithium was making him nauseated and caused him to vomit repeatedly. (R. 241-42). Dr. Johnson discontinued his Lithium prescription in favor of Lexapro.[18] (R. 242). At a follow-up visit on June 30, 2009, Espinoza's depression had "vanished" and his demeanor was "dramatically improved[.]" (R. 239-40). However, he complained that his pain was still not being adequately controlled, despite improvement. (R. 239). Dr. Johnson increased both his MS Contin and MSIR dosages. (R. 240).

On August 21, 2009, Espinoza visited Dr. Johnson to discuss the possibility of applying for disability benefits and to refill his medications. (R. 236). His medications were refilled and he was advised to contact the Social Security Administration. *Id*.

On December 11, 2009, Espinoza requested adjustments to cheaper medications because he had lost his insurance coverage. (R. 234-35). Dr. Johnson noted that Espinoza had been laid off of work and could no longer afford his previous medications. (R. 234). Espinoza conveyed to the doctor that his pain had decreased as a result of not working anymore. *Id.* He was assessed with hypertension and depression and his medications were adjusted. (R. 234-35).

On January 26, 2010, Espinoza presented as a new patient to Terrol G.Ramsey, M.D. and reported chronic leg, back, knee, foot, and hip pain along with hypertension. (R. 232). Dr. Ramsey noted localized tenderness in Espinoza's back, limited flexion due to back spasms, and

---

[18] Lexapro is prescribed for the acute treatment of generalized anxiety disorder. *www.pdr.net.*

negative straight leg raising.  *Id.*  Dr. Ramsey's assessment was back pain, knee pain, and benign hypertension and new medications were prescribed.  (R. 232-33).

Espinoza underwent a physical examination with Janan Lane, D.O., related to his employment on May 10, 2010 at Concentra Medical Centers.  (R. 310-24).  The records of the examination appear to be internally inconsistent.  A portion of the records state that Espinoza was "able to perform essential functions" while other portions indicate that Espinoza was "unable to perform essential functions."  (R. 312, 314, 320).  Similarly, "no medical restrictions" were noted on one page while others noted restrictions of squatting, kneeling, crawling, and exposure to safety sensitive positions.  *Id.*

.  On May 12, 2010, Espinoza visited Dr. Ramsey for another work-related physical.  (R. 229-31).  According to Espinoza, his employer needed clearance for him to work while on his medications.  (R. 230).  In addition, he reported aching and chronic pain in his lumbar region and needed a reevaluation of his depression and medications.  *Id.*  Dr. Ramsey noted Espinoza's limited range of motion, deformed left ankle, and flat feet.  *Id.*  His assessment was back and ankle pain.  *Id.*  Dr. Ramsey again prescribed Morphine and continued all other medications.  (R. 231).  Dr. Ramsey noted that Espinoza should not lift over 100 pounds.  (R. 229).

On October 4, 2010, Espinoza presented for a checkup and reported symptoms of depressed mood, sadness, irritability, fatigue or loss of energy, and chronic long-term pain.  (R. 305-06).  Dr. Ramsey's assessment was depression and back pain.  (R. 305).  Espinoza was prescribed Paroxetine[19] and Morphine.  (R. 306).

---

[19] Paroxetine is also known as Paxil, and is prescribed to treat manic depression, panic disorder, obsessive compulsive disorder, social anxiety, generalized anxiety, and post traumatic stress disorder ("PTSD").  *www.pdr.net.*

On June 29, 2011, Espinoza presented to Dr. Ramsey for another checkup and he was assessed with benign hypertension, depression, as well as hip and ankle pain. (R. 307-08). Espinoza expressed no side effects or complications related to his medications during that visit. (R. 307).

On December 30, 2011, Espinoza visited Dr. Ramsey's office to complete disability paperwork. (R. 354-56). Espinoza reported chronic back, joint, and leg pain as well as depression and hypertension. (R. 354-55). Dr. Ramsey noted that Espinoza's left ankle had a painful and limited range of motion. (R. 355). Espinoza had tenderness to palpation in his lower lumbar spine and straight leg raises were positive on the left. *Id*. Dr. Ramsey's diagnosis was degenerative disc disease of the lumbar spine, pes planus congenital, deformities in the ankle/ foot, hypertension, and depression. (R. 356).

On that same date, Dr. Ramsey completed a medical source statement ("MSS"). (R. 325-27). Dr. Ramsey opined that Espinoza's limitations included: the ability to occasionally lift or carry twenty pounds or less, frequently lift ten pounds or less, the ability to stand and/or walk with normal breaks for less than two hours in an eight hour workday, the ability to sit less than two hours per eight-hour workday, and that Espinoza would need to periodically alternate sitting and standing to relieve pain or discomfort. (R. 326). Dr. Ramsey further indicated that Espinoza could not kneel, crouch, crawl, or stoop. (R. 327). In support of these opinions, Dr. Ramsey noted Espinoza's degenerative joint disease, lower back, and disc issues. *Id.* He further indicated that changes in Espinoza's working environment were likely to affect his joint pain, and that he must avoid all exposure to hazardous machinery, dangerous equipment, and heights. *Id*.

## Agency Examinations and Assessments

A mental status examination was performed by agency examiner Dennis Rawlings, Ph.D., on October 27, 2010. (R. 266-75). Espinoza's chief complaints were ankle, knee, lower back, and hip pain, in addition to symptoms associated with bipolar disorder. (R. 270). He reported harsh discipline, emotional, physical, and sexual abuse as a child. *Id.* He denied any phobias or anxiety disorders, but did report passive suicidal ideas as well as homicidal ideation, without impulse or plan. (R. 273). He reported mood swings, irritability, racing thoughts, feelings associated with depression such as sadness, helplessness, and hopelessness, disturbed sleep patterns, and a highly variable appetite. (R. 274). Dr. Rawlings noted that Espinoza's thought process was logical, relevant, and coherent. (R. 273).

Dr. Rawlings noted that Espinoza had unusual mannerisms, such as pain behaviors and difficulties arising and sitting. (R. 268). Espinoza had an observably odd gait that was very wide and "look[ed] almost as of [sic] he [was] walking on his ankles." *Id.* Dr. Rawlings also observed that Espinoza was tired, but hypervigilant, with a flattened, irritable, and depressed mood accompanied by feelings of sadness, helplessness, hopelessness, and worthlessness. (R. 274). Espinoza reported mood swings and disturbed sleep due to pain and nightmares of panic attacks. *Id.*

Dr. Rawlings' Axis I[20] diagnoses were bipolar I disorder, panic disorder without agoraphobia, pain disorder, post-traumatic stress disorder, sustained alcohol dependence in full

---

[20] The multiaxial system "facilitates comprehensive and systematic evaluation." *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 27 (Text Revision 4th ed. 2000) (hereinafter "DSM IV").

sustained remission, and amphetamine dependence in full sustained remission. (R. 274-75). Dr. Rawlings assessed a past year Global Assessment of Functioning ("GAF")[21] of 60, and a current GAF of 45. (R. 275). Dr. Rawlings recommended that Espinoza seek psychiatric evaluation and treatment, continued abstainance from alcohol and drugs, abuse counseling and meetings, and a referral to a community mental health center. *Id.*

On December 2, 2010, non-examining agency consultant Joan Holloway, Ph.D., completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity ("MRFC") Assessment. (R. 276-293). On the Psychiatric Review Technique form, Dr. Holloway noted that Espinoza had bipolar disorder resulting in disturbance of mood accompanied by full or partial manic depressive syndrome. (R. 279). Dr. Holloway also indicated that Espinoza suffered from generalized persistent anxiety accompanied by apprehensive expectation. (R. 281). He made further note of the presence of PTSD and panic disorder without agoraphobia. *Id.* Dr. Holloway indicated that Espinoza's somatoform[22] disorders included pain disorder associated with psychological factors. (R. 282). Dr. Holloway also noted behavioral or physical changes associated with the regular use of substances affecting the nervous system resulting in affective and anxiety-related disorders. (R. 284).

---

[21] The GAF score represents Axis V of a Multiaxial Assessment system. *See DSM IV* at 32-36. A GAF score is a subjective determination which represents the "clinician's judgment of the individual's overall level of functioning." *Id.* at 32. The GAF scale is from 1-100. A GAF score of 41-50 reflects "serious symptoms . . . or any serious impairment in social, occupational, or school functioning." *Id.*

[22] Somatoform disorders "physical symptoms that can not be attributed to organic disease and appear to be of a psychic origin." *DORLAND'S* at 1663.

Under "Paragraph B Criteria,"[23] Dr. Holloway determined that Espinoza was mildly restricted in his activities of daily living and in his ability to maintain concentration, persistence, or pace. (R. 286). He found moderate limitation regarding Espinoza's ability to maintain social functioning. *Id.* Dr. Holloway's consultant notes set forth his conclusion that Espinoza had "some mental impairments, especially with social functioning." (R. 288). He further noted that the "severity of impairment does not prevent [Espinoza] from performing simple and some complex tasks in a work related setting." *Id.*

On the same date, Dr. Holloway completed an MRFC assessment. (R. 290-93). He determined that Espinoza was moderately limited in his ability to understand, remember, and carry out detailed instructions as well as in his overall ability to appropriately interact with the general public. (R. 290-91). Dr. Holloway's notes concluded that Espinoza was capable of performing simple and some complex tasks with routine supervision. (R. 292). Furthermore, his capabilities included superficial interaction with supervisors and coworkers, occasional interaction with the general public, and the ability to adapt to a work situation. *Id.*

Non-examining agency physician John Pataki, M.D., completed a Physical Residual Functional Capacity Assessment on December 28, 2010. (R. 294-301). Dr. Pataki concluded that Espinoza could occasionally lift and/or carry twenty pounds, and that he could frequently lift and/or carry ten pounds. (R. 295). Dr. Pataki indicated that Espinoza could sit, stand, and/or

---

[23] There are broad categories known as the "Paragraph B Criteria" of the Listing of Impairments used to assess the severity of a mental impairment. The four categories are (1) restriction of activities of daily living, (2) difficulties in maintaining social functioning, (3) difficulties in maintaining concentration, persistence or pace, and (4) repeated episodes of decompensation, each of extended duration. Social Security Ruling ("SSR") 96-8p; 20 C.F.R. Part 404 Subpt P, App. 1 ("Listings") § 1200.C. *See also Carpenter v. Astrue,* 537 F.3d 1264, 1268-69 (10th Cir. 2008).

walk, with normal breaks, for about six hours in an eight-hour workday. *Id.* He found no exertional limitation in Espinoza's ability to push or pull, including the operation of hand or foot controls. *Id.*

Moreover, Dr. Pataki noted that the medical evidence did not indicate the need for any postural, manipulative, visual, communicative, or environmental limitations. (R. 296-98). Finally, he concluded that the severity of Espinoza's symptoms and their effect on his ability to function were only "partially credible" in regards to the medical evidence examined and the impact of Espinoza's symptoms on his daily activities and usual behavioral habits. (R. 299). Dr. Pataki based these findings primarily on Dr. Ramsey's May 12, 2010 examination. (R. 295).

Non-examining agency consultant Dorothy Millican-Wynn, Ph.D., independently evaluated the medical evidence and concurred with Dr. Holloway's prior assessments on February 12, 2011. (R. 302). On February 24, 2011, non-examining agency consultant Luther Woodcock, M.D., reviewed the evidence and concurred with the prior assessments of Dr. Pataki. (R. 303).

## Procedural History

Espinoza filed his application for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* on July 7, 2010. (R. 149-55). His claim was initially denied on December 28, 2010. (R. 100-04). He filed a request for reconsideration on January 28, 2011 and it was subsequently denied on February 24, 2011. (R. 109-12). An administrative hearing was held before ALJ Jeffrey S. Wolfe on January 26, 2012. (R. 37-97). By decision dated March 16, 2012, the ALJ found that Espinoza was not disabled. (R. 10-29). On February 22, 2013, the Appeals Council denied review of the ALJ's decision. (R. 1-6). Thus, the decision of the ALJ

represents the Commissioner's final decision for the purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A). Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. § 404.1520.[24] *See also Wall v. Astrue*, 561 F.3d 1048, 1052-53 (10th Cir. 2009) (detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax*, 489 F.3d at 1084

---

[24] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

(citation and quotation omitted).

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Wall*, 561 F.3d at 1052 (quotations and citations omitted). Although the court will not reweigh the evidence, the court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Id.*

**Decision of the Administrative Law Judge**

The ALJ found that Espinoza met the insured status requirements through December 31, 2014. (R. 15). At Step One, the ALJ found that Espinoza had not engaged in any substantial gainful activity since his alleged onset date of May 21, 2010. *Id.* At Step Two, the ALJ found that Espinoza had severe impairments including "back impairment with pain, limb pain, obesity, hypertension and depression and anxiety." *Id.* At Step Three, the ALJ found that Espinoza's impairments, or combination of impairments, did not meet any Listing. (R. 16).

The ALJ found that Espinoza had the RFC to perform light work. (R. 17). He stated that Espinoza must have the option to either sit or stand. *Id.* He further determined that Espinoza was capable of performing "simple and some complex tasks with routine supervision." *Id.* He found Espinoza to be capable of superficial interaction with supervisors and coworkers, occasional interaction with the general public, and capable of adapting to a work situation. *Id.*

At Step Four, the ALJ determined that Espinoza was not capable of performing any past relevant work. (R. 24). At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Espinoza could perform, considering his age, education, work experience, and RFC. (R. 25). Therefore, the ALJ found that Espinoza was not disabled from his alleged onset date of May 21, 2010, through the date of his decision. (R. 26).

## Review

Espinoza asks for reversal due to the ALJ's failure to weigh the opinion of Dr. Ramsey, Espinoza's treating physician. The Court agrees that the ALJ's consideration of the opinions given by Dr. Ramsey was inadequate. For this reason, the Court reverses and remands the ALJ's decision.

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). The regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996 WL 374183 ("[O]pinions from any medical source about issues reserved to the Commissioner must never be ignored."). An ALJ must consider the opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection. *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished) (*citing Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003)). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed.

Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

In his decision, the ALJ gave "great weight" to the opinions of the non-examining agency consultants and "little weight" to the opinion of Dr. Lane. (R. 24). However the ALJ did not explain in his decision the weight given to the opinions of Dr. Ramsey. This is significant because Dr. Ramsey gave multiple opinions that were more restrictive and inconsistent with the RFC determination of the ALJ. (R. 326-27). First, Dr. Ramsey opined that Espinoza could stand, walk and sit for less than 2 hours in an 8-hour day. (R. 326). Second, Dr. Ramsey noted that Espinoza had exertional/manipulative limitations of pushing, pulling, reaching, handling, and fingering, as well as a number of postural limitations. (R. 326-27). Third, Dr. Ramsey also opined that Espinoza should be subjected to environmental limitations because changes in his environment negatively affected his pain. (R. 327).

Although the ALJ mentioned Dr. Ramsey's opinion in his decision, he did not explain the inconsistencies between that opinion and the RFC or why he implicitly rejected Dr. Ramsey's opinions. (R. 20-21). *Haga v. Astrue*, 482 F.3d 1205, 1207-08 (10th Cir. 2007); *Confere v. Astrue*, 235 Fed.Appx, 701, 704 (10th Cir. 2007) (*quoting Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996)) (The ALJ "must discuss the uncontroverted evidence he chooses not to rely on, as well as significantly probative evidence he rejects"). Despite the obvious inconsistencies, the ALJ stated that "the record does not contain any opinions from treating or non-treating physicians indicating that Mr. Espinoza. . . has limitations greater than those determined in this decision. (R. 24). This is problematic, particularly in light of the fact that the ALJ's RFC findings were less favorable to Espinoza than the RFC, a more thorough explanation was

necessary. *Wilson v. Colvin*, 541 Fed.Appx. 869, 873-74 (10th Cir. 2013). The inherent difficulty is that it is unclear to the reviewer how the ALJ incorporated or discredited the opinions of Dr. Ramsey. *Krauser v. Astrue*, 638 F.3d 1324, 1330-31 (10th Cir. 2011) (reviewing court was required to remand because it could not meaningfully review the ALJ's determination); *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004) (ALJ's reasons for rejecting treating physician opinion must be sufficiently specific to allow meaningful review).

The ALJ's analysis and discussion of a treating physician's opinion is clearly in contradiction to the requirements set forth in the Regulations. 20 C.F.R. § 416.927. Because the ALJ failed to specify what weight, if any, was given to Dr. Ramsey's opinion and failed to explain the reasons for assigning the weight, or rejecting the opinion, the Court "cannot simply presume the ALJ applied the correct legal standards." *Robinson,* 366 F.3d at 1083. The ALJ is required to make clear the weight given to medical opinions, and the Court "must remand because [it] cannot meaningfully review the ALJ's determination absent findings explaining the weight assigned." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

This Court takes no position on the merits of Johnson's's disability claim, and "[no] particular result" is ordered on remand. *Thompson v. Sullivan*, 987 F.2d 1482, 1492-93 (10th Cir. 1993). This case is remanded only to assure that the correct legal standards are invoked in reaching a decision based on the facts of the case. *Angel v. Barnhart*, 329 F.3d 1208, 1213-14 (10th Cir. 2003), *citing Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).

**CONCLUSION**

Based upon the foregoing, the Court **REVERSES AND REMANDS** the decision of the Commissioner denying disability benefits to Claimant for further proceedings consistent with this Order.

Dated this 20th day of MAY, 2014.

Paul J. Cleary
United States Magistrate Judge